## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES W. SMITH, Derivatively On Behalf Of Nominal Defendant Xybernaut Corporation, | |
| Plaintiff, | Case No. |
| v. | SHAREHOLDER DERIVATIVE COMPLAINT |
| EDWARD G. NEWMAN, STEVEN A NEWMAN, THOMAS D. DAVIS, BRUCE C. HAYDEN, MARC GINSBERG, MARTIN E. WEISBERG, NORITSUGU YAMAOKA, PHILLIP E. PEARCE, HARRY E. SOYSTER, EDWIN VOGT, ALAN G. MERTEN, JAMES J. RALABATE, WILLIAM G.T. TUTTLE and GRANT THORNTON LLP, | |
| | JURY TRIAL DEMANDED |
| Defendants. | |
| and | |
| XYBERNAUT CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Charles W. Smith ("Plaintiff" or "Smith") files this Verified Shareholder Derivative Complaint and alleges on information and belief, except as to those allegations that pertain to Plaintiff which are alleged on personal knowledge, as follows:

### NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a shareholder derivative action brought by a shareholder of Xybernaut Corporation ("Xybernaut" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy Individual Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement and waste of

corporate assets that occurred from May 10, 2002 and April 8, 2005 (the "Relevant Period") and that have caused substantial losses to Xybernaut and other damages, such as to its reputation, goodwill and ability to secure monies in the capital markets.

2.      Xybernaut is engaged in the research, development, manufacturing, marketing and sales of mobile, wearable computing and communication systems, and software and service solutions to enhance product management, asset management, and the accuracy, timeliness and utilization of captured data.  The Company's flagship products include Atigo wireless displays, which are computerized units which provide remote and mobile service representatives with wireless and just-in-time access to product and customer data, and Mobile Assistant® wearable computers, which provide the power and functionality of a desktop computer in remote, rugged and space-constrained settings.

3.      During the Relevant Period, the Individual Defendants caused Xybernaut to report quarter after quarter of positive results in press releases and filings with the SEC. The Individual Defendants caused the Company to attribute the results to, among other things, the sale of its handheld and wearable computer devices, as well as cost-cutting programs, financings, intellectual property licensing strategies, strategic partnerships and securing key accounts in the transportation, retail, military and homeland security sectors. For example, in a press release announcing the Company's fourth quarter and full-year 2003 results, Defendant Edward G. Newman, Chief Executive Officer and Chairman of Xybernaut, stated, "Management firmly believes that the ***best is yet to come*** and ***we expect to extend the positive momentum*** the Company is currently experiencing."  (emphasis added).  In reaction to these statements, the price of Xybernaut stock traded as high as $2.56 per

share during the Relevant Period (on September 18, 2003). These statements were materially false and misleading because Individual Defendants failed to disclose that the Company's purported success was the result of, in material part, improper accounting, made possible by a serious breakdown in the Company's internal controls.

4.     The truth began to emerge on February 17, 2005. On that day, after weeks of decline in the price of Xybernaut stock, the Individual Defendants caused the Company to issue a press release stating "that it knows of no business reason or financial condition that would explain the decline in its stock price." In reaction to this announcement, the price of Xybernaut stock closed higher at $0.92 per share, up $0.07 from its closing price on February 16, 2005.

5.     On March 14, 2005, the Individual Defendants caused Xybernaut to issue a press release announcing that it would be unable to file its 2004 annual report on time. The press release stated that the Company expected to file its annual report by March 31, 2005. In reaction to this news, the price of Xybernaut stock fell $0.12 from its closing price of $0.72 on March 11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

6.     On March 31, 2005, after the market closed, Individual Defendants issued a press release revealing that it had discovered material weaknesses in Xybernaut's internal controls with respect to expense reimbursement, revenue recognition, and the monitoring of business risks. The press release stated that the Company had engaged independent legal counsel to conduct an internal investigation of these matters. The press release also stated that, as a result of the investigation, the Company could not predict when it would be able to file its 2004 annual report with the SEC, and cautioned that the delayed filing would prevent the Company from registering additional shares of stock. In addition, the press release

revealed for the first time that, on February 1, 2005, **nearly two months earlier,** the Company had received a subpoena from the SEC seeking documents relating to the sale of securities by an unidentified shareholder.   Xybernaut also announced that it had received notification from NASDAQ that the Company's stock, which had been trading below $1.00 per share, was subject to delisting.   In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005.

7.      On April 8, 2005, the last day of the Relevant Period, Individual Defendants disclosed that the Company had received a letter from its auditor, Grant Thornton LLP, questioning the accuracy and reliability of the Company's accounting and related disclosures; the Company's historical financial statements for fiscal 2002 and 2003; and the Company's financial statements for the interim first, second, and third quarters of 2002 and 2003.   In reaction to this news, the price of Xybernaut stock, which had already fallen $0.53 per share since the March 14, 2005 announcement that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

8.      On April 19, 2005, after the market had closed, the Individual Defendants caused the Company to announce the completion of its internal investigation.   Despite the report's lack of specificity, it made clear that the Company's management had engaged in serious undisclosed wrongdoing that had a material impact on the Company's financial condition and performance, and which rendered all statements by Individual Defendants suspect.   In pertinent part, the report determined:

    a. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed to properly substantiate expenses charged to the Company.

    b. Newman's family members were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

    c. The employment of Newman's family members had not been disclosed in SEC filings as required by SEC disclosure regulations.

    d. The Company had failed to adhere to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

    e. Senior Management had entered into major transactions in violation of Company internal controls and concealed material financial conditions of the transactions to the Board.

    f. Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

    g. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

The report stated that the Company had removed, or had requested the resignation of, the officers and directors identified above. Moreover, Grant & Thornton resigned as the Company's auditor because "in its professional judgment, it can no longer rely on management's representations." Additionally, the warnings that "no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors" were repeated.

    9. On April 25, 2005, the Individual Defendants caused Xybernaut to announce that the United States Attorneys Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in the Company's

internal investigation.  In addition, Xybernaut stated that "it continues to face a severe liquidity crisis and possible insolvency" and that there "can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations."

10.    On May 12, 2005, the Individual Defendants caused the Company to announce that it received notification from the NASDAQ Stock Market that its shares were delisted, effective with the opening of the market on May 12, 2005.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Individual Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

12.    A claim asserted herein arises under and pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7243.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. §78aa), 28 U.S.C. § 1367 and 28 U.S.C. § 1331.

13.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.  Venue is proper in this district because Xybernaut is incorporated in this district.

## PARTIES

14.    Plaintiff Charles W. Smith is a resident of the State of California.  Plaintiff is and was at all relevant times, a shareholder of Nominal Defendant Xybernaut.

15.     Nominal Defendant Xybernaut is a Delaware corporation, and maintains its corporate headquarters at 12701 Fair Lakes Circle, Suite 550, Fairfax, Virginia 22033.

16.     Defendant Edward G. Newman ("E. Newman") is a resident of the Commonwealth of Virginia.  E. Newman was, at all relevant times, Chief Executive Officer and Chairman of the Board of the Company.

17.     Defendant Thomas D. Davis ("Davis") is a resident of the Commonwealth of Virginia.  Davis was, at all relevant times, Chief Financial Officer and Senior Vice-President of the Company from November 2002 to November 7, 2004.

18.     Defendant Steven A. Newman ("S. Newman") is a resident of the Commonwealth of Virginia.  S. Newman was, at all relevant times, President, Chief Operating Officer and Vice-Chairman of the Company.

19.     Defendant Bruce C. Hayden ("Hayden") is a resident of the Commonwealth of Virginia.  Hayden was, at all relevant times, Chief Financial Officer and Senior Vice-President of the Company from November 8, 2004 to present.

20.     Defendant Marc Ginsberg ("Ginsberg") is a resident of the Commonwealth of Virginia.  Ginsberg was, at all relevant times, a member of the Board of Directors of the Company.  As of April 23, 2005, he was a co-chairman of the Office of the Chairman of the Board of Directors.

21.     Defendant Martin E. Weisberg ("Weisberg") is a resident of the Commonwealth of Virginia.  Weisberg was, at all relevant times, a member of the Board of Directors of the Company.  He resigned on May 23, 2005.

22.    Defendant Noritsugu Yamaoka ("Yamaoka") is a resident of the Commonwealth of Virginia.  Yamaoka was, at all relevant times, a member of the Board of Directors of the Company.

23.    Defendant Phillip E. Pearce ("Pearce") is a resident of the State of North Carolina.  Pearce was, at all relevant times, a member of the Board of Directors of the Company.

24.    Defendant Harry E. Soyster ("Soyster") is a resident of the Commonwealth of Virginia.  Soyster was, at all relevant times, a member of the Board of Directors of the Company.  As of April 23, 2005, he was a co-chairman of the Office of the Chairman of the Board of Directors.

25.    Defendant Edwin Vogt ("Vogt") is a resident of Germany.  Vogt was, at all relevant times, a member of the Board of Directors of the Company.  He resigned on June 3, 2005.

26.    Defendant Alan G. Merten ("Merten") is a resident of the Commonwealth of Virginia.  Merten was, at all relevant times, a member of the Board of Directors of the Company.

27.    Defendant James J. Ralabate ("Ralabate") is a resident of the State of New York.  Ralabate was, at all relevant times, a member of the Board of Directors of the Company.  He resigned on May 19, 2005.

28.    Defendant William G. T. Tuttle ("Tuttle") is a resident of the Commonwealth of Virginia.  Tuttle was, at all relevant times, a member of the Board of Directors of the Company.  As of April 23, 2005, he was a co-chairman of the Office of the Chairman of the Board of Directors.

29.    Defendants E. Newman, S. Newman, Davis, Hayden, Ginsberg, Weisberg, Yamaoka, Pearce, Soyster, Vogt, Merten, Ralabate, and Tuttle are collectively referred to herein as the "Individual Defendants." Defendants E. Newman, S. Newman, Ginsberg, Weisberg, Yamaoka, Pearce, Soyster, Vogt, Merten, Ralabate and Tuttle are collectively referred to herein as the "Director Defendants."

30.    Defendant Grant Thornton LLP ("Grant Thornton") is a worldwide firm of certified public accountants that provides tax, assurance and advisory services. Grant Thornton is a member firm of Grant Thornton International, one of six international accounting, tax and business advisory organizations. At all relevant times, Grant Thornton served as the Company's auditor until its resignation on or about April 14, 2005. Grant Thornton maintains its principal executive office in the United States at 175 West Jackson Boulevard, Chicago, Illinois 60604, and the office located at 2070 Chain Ridge Road, Suite 300, Vienna, Virginia 22182, oversaw the audits at issue in this case.

31.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

32.    Each of the above officers and directors of Xybernaut, by virtue of their high-level positions with the Company, directly participated in the management of the Company,

was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

33.    As officers and directors persons of a publicly-held company whose common stock was, and is, registered with the SEC, traded on the NASDAQ during the Relevant Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

34.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with

Xybernaut, each of the Individual Defendants had access to the adverse undisclosed information about Xybernaut's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Xybernaut and its business issued or adopted by the Company materially false and misleading.

35.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

36.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Xybernaut's business, finances, financial statements and the intrinsic value of Xybernaut common stock, thereby causing the Company harm through the waste of corporate assets and being subject to a "liar's discount" when seeking capital from the various financial markets.

## SUBSTANTIVE ALLEGATIONS

11

Materially False and Misleading
Statements Made During The Relevant Period

37. On May 9, 2002, after the market closed, the Individual Defendants caused

Xybernaut to issue a press release in which it announced its first quarter 2002 results. The

release reported "the highest first quarter results in the Company's history," stating, in

relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--May 9, 2002--Xybernaut Corporation
> (Nasdaq:XYBR) today announced quarterly revenues of $2.8 million for its first
> quarter ended March 31, 2002, the highest first quarter results in the
> Company's history.
>
> This represents a 24% increase compared with $2.3 million for the
> corresponding period a year ago.
>
> Hardware revenue for the quarter was $1.8 million, an increase of 38% from
> $1.3 million for the same period in the prior year. The net loss applicable to
> holders of common stock for the first quarter was $8.0 million, or $0.13 per
> share, compared with $5.9 million, also $0.13 per share, for the same period
> in the prior year.
>
> Results for the first quarter are consistent with the guidance previously given.

Defendant Edward G. Newman commented on the purportedly strong results as follows:

> "We are now beginning to see tangible results from the investments we have
> made in developing our technology platforms and our efforts to cultivate
> strategic vertical industry sectors," said Edward G. Newman, chairman,
> president and CEO for Xybernaut. "We have realized considerable success in
> various metrics that we consider key indicators of strong revenue growth. In
> addition, our restructuring activities are progressing well and we expect to
> achieve the savings outlined in our earlier announcement."

In addition, the press release reported the following:

> Enterprise customers are moving into broader deployments of Xybernaut
> solutions. Through the end of the first quarter 2002, the Company has sold
> more than 3,500 units of the Mobile Assistant series and realized over $17
> million in revenues from those sales.

Xybernaut continues to expand Team Xybernaut(SM), its community of value-added resellers (VARs) and systems integrators.  As of the end of the first quarter of 2001, less than 20 companies were participating in Team Xybernaut.  Comparatively, during the first quarter of 2002 alone Xybernaut completed more than 20 Team Xybernaut agreements bringing the number of completed Team Xybernaut agreements to more than 95 since the program's inception.

Guidance

The Company is increasing quarterly revenue guidance for the remainder of this year to 30% to 60% increases in revenue from the same quarters in the prior year.

This guidance is up from the 25% to 50% quarterly increase previously provided.  This guidance range indicates expected revenues of $2.6 million to $3.2 million for the second quarter ending June 30, 2002.

38.    On May 15, 2002, the Individual Defendants caused the Company to file its first quarter 2002 report with the SEC on a Form 10-Q, reiterating the results announced in the May 9, 2002 press release.

39.    On July 11, 2002, the Individual Defendants caused the Company to issue a press release announcing that it had raised more than $5 million in equity capital through a $4 million private placement of common stock with institutional investors and the exercise of approximately $1 million of warrants.

40.    On August 13, 2002, the Individual Defendants caused the Company to issue a press release announcing the second quarter 2002 results.  The release stated, in relevant part, as follows:

FAIRFAX, Va., Aug 13, 2002 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ: XYBR) today announced quarterly revenues of $2.0 million for its second quarter ended June 30, 2002, or approximately the same as revenues for the second quarter a year ago, and consistent with prior revised guidance.  The net loss for the second quarter was $6.7 million, or $0.10 per share, compared with $8.5 million, or $0.17 per share, for the same period in the prior year.

13

Hardware revenue for the quarter was $1.2 million, an increase of 102% from $0.6 million for the same period in the prior year.

Operating expenses for the second quarter were $6.9 million, not including restructuring charges, a reduction of 21% from $8.7 million in the first quarter ending March 31, 2002 and a reduction of 31% from $10.1 million in the fourth quarter ending December 31, 2001.

Revenue for the six months ended June 30, 2002 was $4.8 million, representing an increase of 12% versus revenue of $4.3 million for the same period a year ago. The Company reported a net loss of $14.7 million for the first six months of 2002, or $0.23 per share, versus a loss of $14.4 million, or $0.30 per share, for the first six months of 2001.

"We are now beginning to see tangible results from the restructuring actions initiated earlier this year. These actions have included reductions in workforce, reductions in overseas operations and salary reductions for top executives ranging from 20-25%," said Edward G. Newman, chairman, president and CEO for Xybernaut. "With these cost reductions and expected revenue increases, we look forward to achieving our target of profitability in 2003," Newman added.

<u>Revenue Guidance</u>

The Company reaffirmed revenue guidance for the third and fourth quarters of 2002 at a 30 to 60% increase from the equivalent quarters in the prior year; however, the Company also noted that the timing of orders and shipment of product could affect the timing of revenue realized in each of those quarters.

41.    On the same day, August 13, 2002, the Individual Defendants caused the Company to file its second quarter 2002 report with the SEC on a Form 10-Q, reiterating the previously announced results.

42.    On November 14, 2002, the Individual Defendants caused Xybernaut to issue a press release announcing its third quarter 2002 results. The release stated, in relevant part, as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--Nov. 14, 2002--Xybernaut(R) Corporation (NASDAQ:XYBR) today announced quarterly revenues of $2.5 million for its third quarter ended September 30, 2002. This represents an increase of

approximately 26% from revenues during the preceding second quarter of 2002 and an increase of approximately 10% over revenues during the comparable third quarter of 2001. The net loss for the third quarter was $7.9 million, or $0.10 per share, compared with $8.1 million, or $0.15 per share, for the same period in the prior year.

Operating expenses, excluding restructuring and other non-recurring charges, for the third quarter of 2002 were $6.0 million, a reduction of 41% from the fourth quarter of 2001 and 14% from the preceding second quarter of 2002.

Revenue for the nine months ended September 30, 2002 was $7.4 million, representing an increase of 11% versus revenue of $6.6 million for the same period a year ago. The Company reported net losses of $22.5 million for both the first nine months of 2002 and 2001.

"Throughout 2002, Xybernaut has successfully introduced new product lines, gained traction in critical industry segments, extended the Team Xybernaut(TM) partner community, strengthened our intellectual property position and demonstrated our ability to raise capital despite difficult market conditions," stated Edward G. Newman, chairman, president and CEO.

"We continue our drive to profitability and see significant benefits from the restructuring and cost cutting initiatives we have undertaken throughout 2002," continued Newman. "We expect to reduce our operating expenses by 50% over prior levels. We have significantly reduced our headcount, restructured agreements with vendors and partners, reduced inventory commitments and implemented various other cost saving strategies such as consolidating international operations. To build upon these successful efforts, I am pleased to announce management changes within Xybernaut."

* * *

Revenue Guidance

The Company's previous guidance for revenues in the fourth quarter of 2002 remains unchanged; however, the Company also noted that the timing of orders and shipment of product could affect the timing of revenue realized in that period.

43.    On the same day, November 14, 2002, the Individual Defendants caused the

Company to file its third quarter 2002 report with the SEC on a Form 10-Q, reiterating the

previously announced results.

15

44.    On March 27, 2003, the Individual Defendants caused Xybernaut to issue a press release announcing its fourth quarter and full-year 2002 results.  In the release, the Company reported a 2% increase in revenues compared to the same period in 2001 and a 17% increase in hardware revenues, stating in relevant part, as follows:

FAIRFAX, Va., Mar 27, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ: XYBR) today announced the results of its operations for the fourth quarter and full year 2002.

Total revenues for 2002 were $10.0 million, a 2% increase over 2001.  These results include a 17% increase in 2002 hardware revenues to $6.1 million. Total revenues for the fourth quarter ended December 31, 2002 were $2.6 million, representing an increase of approximately 2% over revenues during the third quarter of 2002.

Net operating expenses for the fourth quarter of 2002 were $4.5 million, a reduction of 56% from the fourth quarter of 2001 and 26% from the third quarter of 2002.  Net operating expenses exclude restructuring and certain other non-recurring charges and are discussed in further detail below.  Net loss for 2002 decreased 17% from $32.2 million, or $0.63 per share, for 2001 to $26.6 million, or $0.37 per share, for 2002.

"Xybernaut continues to achieve considerable success despite challenging market conditions," stated Edward G. Newman, chairman, president and CEO.  "We recently launched the third product in the successful Atigo(TM) family of mobile computers.  We continue to strengthen our intellectual property, as evidenced through recent announcements of patent grants and an aggressive new licensing strategy.  We have reorganized our management structure and strengthened our corporate governance through the appointment of two new independent directors to our board.  Furthermore, we are amongst a small number of technology companies actually deploying comprehensive solutions into first responder and homeland security communities," added Newman.

"I am very pleased to announce that Xybernaut has surpassed our previously stated targets related to reductions in operating expenses, as evidenced by the 56% decline in net operating expenses for the fourth quarter of 2002 over the comparable 2001 period," stated Tom Davis, senior vice president and CFO.  "Additionally, we have recently been successful in eliminating a considerable amount of long-term liabilities and commitments relating to both product and inventory."

45.    On March 28, 2003, the Individual Defendants caused Xybernaut to file its 2002 annual report with the SEC on a Form 10-K, reiterating the previously announced results in the March 27, 2003 press release.

46.    On April 2, 2003, the Individual Defendants caused the Company to announce that the Company had raised $6.1 million from the completion of a $2.0 million private placement of common stock with institutional investors, a long-term borrowing of $1.75 million and the exercise of approximately $2.4 million of warrants.  In reaction to this news, the price of Xybernaut stock rose $0.04 per share from its previous day's closing price of $0.38, to close at $0.42 on April 2, 2003.

47.    On June 19, 2003, the Individual Defendants caused the Company to issue a press release announcing that it had raised another $7.75 million through private placements of Xybernaut common stock and the exercise of warrants.

48.    On August 11, 2003, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2003 results.  The press release stated, in relevant part, as follows:

> FAIRFAX, Va., Aug 11, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the second quarter of 2003 (three months ended June 30) was $2.8 million, a 56% increase from the preceding first quarter of 2003, and a 38% increase from the comparable period in 2002.
>
> As of June 30, the Company had no long-term debt, a stockholders' equity balance of over $11 million and more than $5 million of cash on-hand. Subsequent to June 30, the Company also reported that it had raised an additional $3 million through warrant exercises.
>
> Hardware revenue for the second quarter of 2003 was $1.8 million, a 115% increase from the first quarter of 2003 and a 53% increase from the second quarter of 2002.

Gross margin from hardware sales increased to 33% for the three months ended June 30, 2003 as compared with 12% for the three months ended June 30, 2002.  Margin for consulting and other sales increased to 38% in the second quarter of 2003 versus 34% in the second quarter of 2002.

The net loss for the second quarter of 2003 decreased over 50% to $3.3 million from the second quarter of 2002.  The net loss per share also decreased to $0.02 per share from $0.10 per share in the prior year.

"The Company is moving in the right direction in virtually all areas.  We are pleased with our second quarter results and especially the record revenue levels that we achieved.  We are determined to do even better on all fronts as we move forward and my outlook remains highly positive," stated Steven A. Newman, Xybernaut president.

Thomas D. Davis, senior vice president and CFO, added, "We have continued our cost cutting efforts into 2003, streamlined operations and, with significant cash on-hand we now believe that we have more than enough capital to last us through the end of the year."

"From recent meetings with executives of some of the world's largest companies, I've seen first hand that these business leaders recognize that wearable computing has moved from a possible to a preferred mobile computing solution," stated Edward G. Newman, chairman and CEO.  "Our primary objective is to steadily increase stakeholder value by leveraging these relationships and others as well as our expertise and successes to produce tangible results."

49.    On August 13, 2003, the Individual Defendants caused the Company to file its second quarter 2003 report with the SEC on a Form 10-Q which reiterated the results announced in the August 11, 2003 press release.

50.    On September 10, 2003, the Individual Defendants caused the Company to issue a press release announcing that the Company had been awarded a contract worth $1.62 million by the U.S. Department of Defense to provide wearable computing technologies and solutions for U.S. military aircraft and defense maintenance systems. Defendant E. Newman touted the award of the defense contract, stating as follows:

"We are clearly proving that we have the desired mix of products, professional services and industry expertise to successfully compete for and win large contract awards from the U.S. military," stated Edward G. Newman, chairman and chief executive officer of Xybernaut. "Our years of effort invested in cultivating opportunities in this sector are yielding tangible, quantifiable results and demonstrate that Xybernaut is indeed being viewed as the preferred solution provider of wearable/computing solutions for our military forces."

In addition, Defendant S. Newman stated as follows:

"Xybernaut continues to execute key growth strategies to develop scalable, replicable mobile/wearable computing solutions that anticipate our customers' needs and deliver full function computing power where and when it is needed," said Steven A. Newman, Xybernaut president. "Xybernaut is meeting the unique and sophisticated demands of the U.S. military and fully expects that this relationship will drive dynamic revenue growth for our Company on an on-going basis."

In reaction to this news, the price of Xybernaut stock traded as high as $1.40 per share on volume of over 25 million on September 10, 2003 before closing at $1.25.

51. On September 29, 2003, the Individual Defendants caused the Company to announce the completion of another private placement of Xybernaut common stock for proceeds of approximately $7 million. In addition, the announcement stated that the Company had received notification from NASDAQ that it was in full compliance with NASDAQ continued listing requirements. Defendants Davis and E. Newman commented on the purported success of the financing as follows:

"These financings were executed with favorable terms and help us achieve what I consider to be the Company's strongest financial position since the initial public offering," stated Thomas D. Davis, Xybernaut CFO. "We have a strong cash position, maintain no debt and continue to keep our operating expenses at a low level."

"We've seen positive results in recent quarters from our sales, marketing and business development efforts; we've introduced new and innovative products; we've secured important patents while aggressively protecting our intellectual property; and we are involved in numerous business ventures with key partners," said Edward G. Newman, Xybernaut chairman and CEO. "By

taking advantage of this opportunity to strengthen our capital structure, Xybernaut is in a better position than ever to extend our recent positive momentum and continue to deliver the results that our customers and stakeholders deserve."

52.    On November 13, 2003, the Individual Defendants caused Xybernaut to issue a press release announcing the third quarter 2003 results, including a 6%, or $2.7 million, increase in revenues compared to the same period in 2002.  The release stated, in relevant part, as follows:

FAIRFAX, Va., Nov 13, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the third quarter of 2003 (three months ended September 30) was $2.7 million, a 6% increase from the same period in 2002.  These results represent the second highest levels of both U.S. revenues as well as worldwide consulting revenues in the Company's history.

Net operating expenses for the three months ended September 30, 2003 declined for the seventh consecutive quarter to $3.8 million.  This represents a reduction of over 62% from the fourth quarter of 2001 and a 36% reduction from the third quarter of 2002.

The term "net operating expense" is discussed and reconciled in the "Non-GAAP Financial Measure" section of this press release.

At September 30, the Company had no long-term debt, record quarter-end cash of over $13 million and record stockholders' equity of over $17 million.

The net loss for the third quarter of 2003 decreased 41% to $4.7 million from the third quarter of 2002.  The net loss per share also decreased to $0.03 per share from $0.10 per share in the prior year.

Defendant Davis commented on purportedly strong results, stating "Our future has never looked brighter."  In addition, Davis stated as follows, in relevant part:

Thomas D. Davis, CFO, noted, "Our cash and stockholders equity balances are both at record levels, we have no long term debt and we have successfully cut costs for seven consecutive quarters.  I continue to believe that we have the strongest financial position since our IPO."

"Perhaps one of the best measures of our success is our ability to replicate customer wins in strategic markets," stated Steven A. Newman, president of Xybernaut. "For example, since the Company's inception, we have secured hardware and services contracts in the transportation sector, alone, surpassing more than $10 million. This focused approach is also producing similar strong results in many other targeted industries. Our future has never looked brighter."

53.    On the same day, November 13, 2003, the Individual Defendants caused the Company to file its third quarter 2003 report with the SEC on a Form 10-Q, reiterating the results announced in the press release issued on the same day.

54.    On March 9, 2004, the Individual Defendants caused the Company to issue a press release announcing "record" results for the fourth quarter and full-year 2004. The release stated, in relevant part, as follows:

The Company recorded its highest quarterly revenue ever during the fourth quarter of 2003. Revenue for the quarter ended December 31, 2003 was $3.7 million, a 43% increase over the fourth quarter of 2002 and a 38% increase over the third quarter of 2003. Total revenue for the full year 2003 increased 10% to $11.0 million, compared to $10.0 million for 2002. These year-end results include the highest levels of both product and consulting services revenues in the Company's history.

The Company's net loss for the fourth quarter of 2003 was $5.3 million compared to a loss of $4.0 million in the comparable quarter of the prior year. The net loss for the entire year ended December 31, 2003 was $18.6 million compared to a loss of $26.6 million for 2002.

At December 31, 2003, the Company had no long-term debt, cash of $9.5 million and stockholders' equity of $15.9 million.

"The management and staff at Xybernaut have never been more focused," said Edward G. Newman, chairman and CEO of Xybernaut. "From record revenues, no debt and strong financial fundamentals; to growing demand from existing and new customers; to recent international successes, we are achieving on every level. Building on these achievements, management continues to be optimistic and encouraged by the prospects for 2004 and beyond."

55.    On March 12, 2004, the Individual Defendants caused the Company to file its 2003 annual report on a Form 10-K with the SEC, reiterating the results announced in the March 9, 2004 press release.

56.    On May 4, 2004, the Individual Defendants caused Xybernaut to issue a press release announcing the first quarter 2004 results, reporting a 146% increase in total revenue from the same period in 2003.   The release stated, in relevant part, as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--May 4, 2004--Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the first quarter ended March 31, 2004 was $4.4 million, a 146% increase over the comparable 2003 period.   Hardware revenue for the first quarter of 2004 totaled $2.9 million, increasing 256% from the first quarter of 2003.

This represents the Company's second consecutive quarter of record revenue.  Last quarter, the period ended December 31, 2003, the Company reported revenue of $3.7 million, a 43% increase in revenue over the fourth quarter of 2002.

As of the end of the first quarter 2004, the Company had no long-term debt, cash of $12.5 million and record stockholders' equity of $18.3 million.

"We are pleased to announce back-to-back quarters with record revenue and strong year-to-year revenue growth," said Edward G. Newman, chairman and CEO of Xybernaut.  "This strong momentum helps validate our belief that the more widespread adoption of wearable/mobile technologies is happening now.  Our products and solutions are being deployed today and they are being deployed in record numbers.  With low expenses and our losses decreasing, I continue to remain optimistic and positive about our prospects for the remainder of 2004 and thereafter," continued Newman.

57.    On May 7, 2004, the Individual Defendants caused the Company to file its 2003 annual report with the SEC on a Form 10-K, reiterating the results announced in the May 4, 2004 press release.

58.    On August 5, 2004, the Individual Defendants caused Xybernaut to issue a press release announcing the second quarter 2004 results, reporting a 21%, or $3.4 million,

increase in total revenue from the same period in 2003. The release stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--Aug. 5, 2004--Xybernaut(R) Corporation (NASDAQ:XYBR) today announced results for its second quarter ended June 30, 2004. Total revenue for the second quarter of 2004 was $3.4 million, a 21% increase from the comparable 2003 period. Total revenue for the six months ended June 30, 2004 was $7.8 million, a 70% increase from the six months ended June 30, 2003. Beginning with the fourth quarter of 2003 and continuing through the second quarter of 2004, the Company has now reported its highest three quarterly revenues ever.
>
> The Company also reported a strong balance sheet. As of June 30, 2004, the Company had no long-term debt, cash of $13.3 million and stockholders' equity of $16.5 million.

Defendant E. Newman touted the Company's results as follows:

> "With revenues up 70%, the value of our intellectual property now being validated and having just come off the Company's strongest three quarters ever, I am confident that we are not only on the right track but also that our growth in many areas will now be sharply accelerating as we move forward," said Edward G. Newman, chairman and CEO of Xybernaut.
>
> "Xybernaut solutions and technologies based on our intellectual property are now being deployed into a wide variety of major market sectors from homeland security applications used to examine moving cargo containers; to systems that can detect guns; to in-the-field monitoring solutions to combat West Nile virus; to information delivery systems used by Wall Street traders; to even a solution that will allow a disabled child to learn to communicate," Newman added.

59.    On August 6, 2004, the Individual Defendants caused the Company to file its second quarter 2004 report with the SEC on a Form 10-Q, reiterating the results announced in the August 5, 2004 press release.

60.    On November 9, 2004, the Individual Defendants caused the Company to issue a press release announcing the third quarter 2004 results and reporting another increase in total revenue, as follows:

FAIRFAX, Va., Nov 9, 2004 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced results for its third quarter ended September 30, 2004.  Total revenue for the third quarter of 2004 was $3.2 million, a 20% increase from the comparable 2003 period.  Total revenue for the nine months ended September 30, 2004 was $11.0 million, a 51% increase from the nine months ended September 30, 2003.

Other financial highlights for the three months ended September 30, 2004 include:

-- Licensing revenue from the non-exclusive grant of one of the Company's "Dual-Use Flat Panel Display" patents;

-- Shipments of Atigo T systems to Tesco pursuant to the Company's recently announced $9 million order; and

-- Beginning with the fourth quarter of 2003 and continuing through the third quarter of 2004, the Company has now reported its highest four quarterly revenues ever.

Defendant E. Newman claimed that the Company was experiencing "top-line growth," stating, as follows:

"We are well on our way to our most successful year ever.  In fact, our total nine-month revenues have already surpassed our previous 12-month high," stated Edward G. Newman, chairman and CEO of Xybernaut.  "This top-line growth is the direct result of our continued and successful efforts to bring in new and larger customers while still maintaining our focus on existing partners.  With our recently announced management team and enhanced corporate governance initiatives in place, I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond."

61.     On the same day, November 9, 2004, the Individual Defendants caused the Company to file its third quarter 2004 report with the SEC on a Form 10-Q, reiterating the results announced in the press release issued on the same day.

62.     On December 16, 2004, the Individual Defendants caused the Company to issue a press release about the annual shareholder meeting.  In the release, Defendant S. Newman stated that "2004 continues to be a banner year for the company as we anticipate

continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

63.    The statements referenced above in ¶¶37-62 were materially false and misleading and known, or recklessly disregarded, as such by the Individual Defendants because they failed to disclose the following facts, among others:

a.    the Company's accounting and related disclosures in its financial statements during the Relevant Period were inadequate, improper, and inherently unreliable as evidenced by, among other things, the Company's auditor's public declaration that "it can no longer rely on management's representations";

b.    Defendant Edward G. Newman misappropriated Company funds for personal expenses;

c.    the SEC had commenced an investigation of the Company relating to the sale of Xybernaut securities by a shareholder; and

d.    the Company lacked adequate internal controls.

## THE TRUTH BEGINS TO EMERGE

64.    The truth began to emerge on February 17, 2005. On that day, after weeks of decline in the price of the Company's stock, the Individual Defendants caused Xybernaut to issue a press release responding to shareholder inquiries, stating "that it knows of no business reason or financial condition that would explain the decline in its stock price."

65.    On March 14, 2005, the Individual Defendants caused Xybernaut to issue a press release announcing that it had sought, and was granted, an extension to file its 2004 annual report with the SEC. The Company stated that it intended to file its annual report by March 31, 2005. In reaction to this news, the price of Xybernaut stock fell another $0.12

from its closing price of $0.72 on March 11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

66.    The statements referenced above in ¶¶64 and 65 were materially false and misleading and known or recklessly disregarded as such by Individual Defendants for the reasons set forth in ¶63.

67.    On March 31, 2005, after the market closed, Individual Defendants issued a press release revealing that they had discovered material weaknesses in Xybernaut's internal controls with respect to expense reimbursement, revenue recognition, and the monitoring of business risks.  Individual Defendants stated that the Company had engaged independent legal counsel to conduct an internal investigation of these matters.  Moreover, Individual Defendants stated that as a result of the investigation, the Company could not predict when it would be able to file its 2004 annual report with the SEC, and cautioned that the delayed filing would prevent the Company from registering additional shares of stock.  In addition, the Individual Defendants revealed for the first time that, on February 1, 2005, *virtually two months earlier,* it had received a subpoena from the SEC relating to the sale of securities by an unidentified shareholder.  The Individual Defendants caused Xybernaut to announce that it had received notification from NASDAQ that the Company's stock, which had been trading below $1.00 per share, was subject to delisting.  The announcement stated, as follows:

> FAIRFAX, Va., Mar 31, 2005 (BUSINESS WIRE) -- Xybernaut Corporation (NASDAQ:XYBR) announced today that the filing of its Form 10-K and other related reports for the year ended December 31, 2004, anticipated to occur today, will be further delayed, pending completion of an internal investigation undertaken by its Audit Committee.

On February 28th, the Audit Committee engaged independent counsel - Alston & Bird LLP - to assist it in conducting an internal investigation of, among other things, concerns brought to the Audit Committee's attention relating to the internal control environment of the Company, the propriety of certain expenditures and the documentation of certain expenses of the Chairman and CEO of the Company, the Company's transparency and public disclosure process, the accuracy of certain public disclosures, management's conduct in response to the investigation, and the propriety of certain major transactions. The Audit Committee's investigation is continuing, and the filing of the Company's 10-K will await the conclusions of that investigation.  At this time, the Company is unable to predict when its 10-K will be filed.

On February 1, 2005, the Company received a subpoena from the Northeast Regional Office of the Securities and Exchange Commission, seeking documents and other information relating to the sale of Company securities by any person identified as a selling shareholder in any Company registration statement or other public filing.

As a result of the delayed filing of its Form 10-K, the Company will lose its status to file registration statements on form S-3, which has historically been utilized to expedite the registration of common stock issued in connection with the Company's financings.  The loss of the right to use form S-3 could have a material impact on the ability of the Company to raise additional funds in the future, and therefore affect its ability to meet its obligations as they come due.

Management is still in process of completing the Sarbanes-Oxley 404 internal control testing for the year ended December 31, 2004.  However, certain material weaknesses currently have been identified related to the control environment and control activities as it relates to the Company's policies and procedures in the expense reimbursement process, revenue recognition related to certain product sales, and monitoring of business risks. Management continues to evaluate the identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004 in addition to 4th quarter results.  Revenues for 2004 were approximately $13.9 million, with a net loss of approximately $19.7 million. Revenues for the 4th quarter were approximately $2.9 million, with a net loss of approximately $7.2 million.  These unaudited results do not include possible further adjustments, including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock Market that the bid price of the Company's common stock has closed below the minimum $1.00 per share requirement for the stock's continued listing under Marketplace Rule 4310(c)(4) (the "Rule).  Therefore, the Company has

until September 26, 2005 to become compliant. If, at any time before September 26, 2005, the bid price of the Company's common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, the Company will comply with NASDAQ's listing requirements. If not, NASDAQ will determine whether the Company meets NASDAQ SmallCap Market initial listing criteria as set forth in Marketplace Rule 4310(c), except for the bid requirement. If the Company meets the initial listing criteria, the Company will be granted an additional 180 day compliance period. If the Company is not eligible for an additional compliance period, the Company's securities will be delisted. At that time, the Company can appeal NASDAQ's determination to delist its securities to a Listing Qualifications Panel.

In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005.

68.     On April 8, 2005, the Individual Defendants caused Xybernaut to issue a press release revealing further bad news: the Company had received a letter from its independent auditor, Grant Thornton, questioning the accuracy and reliability of the Company's accounting and related disclosures, and that as a result, investors should not rely on certain of the Company's historical financial statements. The press release stated as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--April 8, 2005--Xybernaut® Corporation (NASDAQ: XYBRE - News) announced today that investors and others should refrain from relying upon the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP, for the years ended December 31, 2002 and 2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.

The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8-K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP.  The Company has retained Kilogram Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments.

The Company also announced today that on April 5, 2005, it received notice from The NASDAQ Stock Market of NASDAQ's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the NASDAQ Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series.  In the notice, NASDAQ asserted that the Company is in violation of NASDAQ Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with NASDAQ and the SEC. Prior to April 12, 2005, the Company intends to request a hearing before a NASDAQ Listing Qualifications Panel to review the staffs determination which will suspend the delisting of the Company's securities until the hearing determination.  There can be no assurance that, following the hearing, the Panel will grant the Company's request for continued listing.

In addition, as provided in the notice, at the opening of business on April 7, 2005, an "E" was appended to the end of the Company's trading symbol for its securities, so that the symbol became "XYBRE."

In reaction to this news, the price of Xybernaut stock, which had already fallen $0.23 per share since the Company's announcement on March 14, 2005 that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

69.    On April 19, 2005, the Individual Defendants caused Xybernaut to issue a press release revealing further bad completion of its internal investigation and the following shocking findings:

1.    The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

2.   Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3.   The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4.   There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5.   Major transactions were entered into by certain members of senior management in violation of Company internal controls.  Certain members of Senior management failed to properly advise the Board of material financial conditions regarding major transactions.

6.   Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7.   Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

1.   Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

2.   Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.

3.   The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.

4.   Retired General William Tuttle was appointed as the Company's Interim Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

5.   The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6.    In an effort to promote the independence of the Company's Board, three
directors of the Company -- James J. Ralabate, Dr. Edwin Vogt and Martin
Weisberg, each of whom provides other services for the Company -- offered
to resign from the Board.  The Board determined to defer its acceptance of
these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the
Company's independent auditors.  The Company received a letter from Grant
Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that,
in its professional judgment, it can no longer rely on management's representations
and has resigned as the Company's registered independent accounting firm.  On
April 8, 2005, the Company advised investors and others that, based upon a letter
the Company received from Grant Thornton LLP on April 6, 2005, no reliance should
be placed upon certain of the Company's historical financial statements, together
with the related audit reports the Company received from its outside auditors.  In
light of Grant Thornton Lip's resignation, the Company advises investors and others
to continue to refrain from relying upon any of the Company's historical financial
statements, together with the related audit reports the Company received from its
outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the
2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of
opinion and were not qualified or modified as to uncertainty, audit scope, or
accounting principles.  In addition, in connection with the audits of the Company's
financial statements for fiscal years 2002 and 2003, and in the subsequent interim
periods, there were no disagreements between the Company and Grant Thornton
LLP on any matter of accounting principles or practices, financial statement
disclosure, or auditing scope or procedure which, if not resolved to the satisfaction
of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference
to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its
professional judgment, it can no longer rely on management's representations.  After
Grant Thornton LLP was advised of the results of the Audit Committee investigation,
Grant Thornton LLP advised the Audit Committee's counsel that certain members of
senior management failed to disclose facts material to the financial statements and
the weaknesses in the internal controls.  The Audit Committee has discussed the
basis for Grant Thornton LLP's conclusion with Grant Thornton LLP and has
authorized Grant Thornton LLP to respond fully to the inquiries of any successor
accountant concerning this subject.    The Audit Committee has reviewed the
Company's disclosure in this press release and in the Company's related Form 8-K
with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

70.     On April 25, 2005, the Individual Defendants caused Xybernaut to announce that the United States Attorneys Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in it internal investigation.  In addition, the press release stated that "[the Company] continues to face a severe liquidity crisis and possible insolvency" and that it may not have sufficient cash to meet its financial obligations or fund continuing operations.  To address these concerns, a press release announced the formation of the Office of the Chairman of the Board consisting of three co-chairmen.  In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--April 25, 2005-- Xybernaut® Corporation (NASDAQ:XYBRE - **News)** today announced that William Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, will serve as co-chairmen in a newly created Office of the Chairman of the Board.  Although the three co-chairmen will act as directors and not as management, they will provide counsel and be a resource to senior management.
>
> On April 23, 2005, Tuttle formally resigned as the Company's Interim Chairman and Chief Executive Officer and joined Soyster and Ginsberg in forming the newly created Office of Chairman of the Board.  Tuttle's resignation was based upon his concerns about his ability to satisfy unilaterally the significant time commitments required to effectively address the needs of shareholders and employees.  Tuttle also stated that he remains committed to continued participation in the effort to determine the best way forward for the Company, working along with Soyster and Ginsberg.
>
> The Company also announced that the Company was contacted Friday, April 22 by the U. S. Attorney's Office for The Eastern District of Virginia, which is opening an investigation.  In addition, the Audit Committee, through its legal counsel, has contacted the Securities and Exchange Commission in connection with the previously disclosed Audit Committee investigation and findings.  The Company will cooperate fully in these investigations and any others.

The Company also affirmed that it continues to face a severe liquidity crisis and possible insolvency. There can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

71.    On May 19, 2005, Defendant Ralabate resigned as a Director of the Company. Defendant Ralabate's law firm, the Law Offices of James J. Ralabate, provided Intellectual Property services to the Company. Additionally, Defendant Ralabate's law firm agreed to reduce its monthly retainer fee from $30,000 to $20,000.

72.    On May 23, 2005, Defendant Weisberg resigned as a Director of the Company. Defendant Weisberg is a partner at the law firm used by the Company for services related to financings, litigation, SEC filings and other general legal matters. The Company has also terminated its relationship with Defendant Weisberg's law firm.

73.    On June 3, 2005, Defendant Vogt resigned as a Director of the Company. As of June 26, 2005, the Company's consulting agreement, dated January 1, 2003, will be terminated. Pursuant to the consulting agreement, Defendant Vogt provided consulting services related to research and development, product sales, marketing, finance and other special projects.

## ADDITIONAL SCIENTER ALLEGATIONS

74.    As alleged herein, Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme alleged herein. In addition, Individual Defendants were motivated to engage in the fraudulent scheme to complete at least $25.85 million in private placements of Company stock and warrants, and long-term borrowings.

75. Further, Defendant E. Newman's wife sold an unusually large number of shares during the Relevant Period in order to benefit from the artificially inflated price as indicated in the chart below:

| Name | Date | Shares | Price | Total |
|------|------|--------|-------|-------|
| E.Newman | 8/30/2004 | 10,000 | $1.20 | $12,000.00 |
| | 8/30/2004 | 5,000 | $1.19 | $5,950.00 |
| | 8/30/2004 | 30,000 | $1.18 | $35,400.00 |
| | 8/31/2004 | 5,000 | $1.18 | $5,900.00 |
| | 8/31/2004 | 15,000 | $1.19 | $17,850.00 |
| | 8/31/2004 | 13,700 | $1.20 | $16,440.00 |
| | 8/31/2004 | 600 | $1.20 | $720.06 |
| | 8/31/2004 | 5,700 | $1.21 | $6,897.00 |
| | 8/31/2004 | 5,000 | $1.22 | $6,100.00 |
| | 8/31/2004 | 3,000 | $1.23 | $3,690.00 |
| | 9/1/2004 | 5,000 | $1.19 | $5,951.00 |
| | 11/16/2004 | 50,000 | $1.09 | $54,500.00 |
| | 12/8/2004 | 10,000 | $1.26 | $12,600.00 |
| | 12/8/2004 | 23,900 | $1.27 | $30,353.00 |
| | 12/8/2004 | 600 | $1.27 | $762.90 |
| | 12/8/2004 | 500 | $1.27 | $635.70 |
| | 12/8/2004 | 600 | $1.29 | $774.06 |
| | 12/8/2004 | 1,000 | $1.29 | $1,290.60 |

| | 12/8/2004 | 8,400 | $1.29 | $10,836.00 |
| | 12/8/2004 | 1,300 | $1.30 | $1,690.00 |
| | 12/8/2004 | 3,700 | $1.31 | $4,847.00 |
| | | | | |
| TOTAL | | **198,000** | | **$235,187.32** |

## THE COMPANY'S FINANCIAL STATEMENTS DURING THE RELEVANT PERIOD WERE MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

76.    At all relevant times during the Relevant Period, Individual Defendants represented that Xybernaut's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.   However, in order to artificially inflate the price of Xybernaut's stock, Individual Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity and earnings during the Relevant Period.

77.    Xybernaut's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Xybernaut's actual operating results.   Specifically, as discussed herein, Individual Defendants caused the Company to violate GAAP by (1) improperly accounting for revenue related to certain product sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and properly account for related party transactions in accordance with GAAP and SEC rules.

78.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.   As set forth in Financial Accounting Standards Board ("FASB") Statements

of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

79.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).

### Individual Defendants' Improper Failure To Disclose Material Related Party Transactions

80.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57, *Related Party Disclosures* (March 1982), GAAP provides guidance on disclosures of transactions between related parties.[1] SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."  Accordingly, SFAS No. 57 requires that financial statements identify material related party transactions and disclose (a) the "nature of the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount

---

1 Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions

of transactions for each period for which an income statement is presented," and (d) the

"[A]mounts due from or to the related parties as of the date of each balance sheet."[2]

81.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

[I]n some cases, the significance of an amount may be independent of the amount involved For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately fin financial statements] even though the dollar amounts involved are relatively small.

82.    Before and during the Relevant Period, the Individual Defendants caused the

Company to engage in numerous material related party and self-dealing transactions that

were not disclosed in its financial statements in violation of GAAP, including at least the

following (during the Relevant Period):

   a.  Defendant Edward Newman's improper use of substantial Company funds for personal expenses and failure to properly substantiate expenses charged to the Company; and

   b.  Major transactions entered into by certain members of senior management in violation Company internal controls and their failure to properly advise the Board of Directors of material financial conditions regarding the transactions.

83.    Moreover, GAAP, in APB Opinion No. *22, Disclosure of Accounting*

*Policies* ¶7 (April 1972), provides that the usefulness of financial statements in making

economic decisions depends significantly upon the user's understanding of the accounting

policies followed by a company.  In fact, GAAP states that information about the accounting

policies adopted by a reporting company is "essential" for financial statement users.  *Id* ¶8.

Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides:

---

2 Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:

    a.  A selection from existing acceptable alternatives;

    b.  Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry; and

    c.  Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

84.    Xybernaut's Relevant Period financial statements were thus also false and misleading and failed to comply with GAAP because they failed to disclose and identify the improper accounting of revenue related to certain product sales.  Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Xybernaut's financial reporting.

85.    These failures violated a number of additional GAAP provisions.  For example, GAAP provides that:

    a.  financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (CON No. 1, ¶34);

    b.  financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (CON No. 1, ¶40);

    c.  financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶50);

    d.  financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (CON No. 1, ¶42);

    e.  financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶58-59);

    f.  financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶79); and

    g.  financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶95, 97).

### Failure to Maintain an Adequate System of Internal Controls

86.    In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Relevant Period, which rendered Xybernaut's financial reporting inherently corrupt, subject to manipulation and unreliable, resulting in materially false and misleading financial statements.

87.    In this regard, the Individual Defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing Individual Defendants to improperly report revenue related to the sale of certain products, and to engage in improper related party transactions.

88.     Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

89.     The Individual Defendants caused Xybernaut to violate Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning reporting of revenue related to certain product sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses.  Accordingly, Section 13(b)(2)(A) of the Exchange Act was violated.

90.     In addition, the Individual Defendants caused Xybernaut to violate Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Proper reviews and checks to ensure that management did not engage in accounting improprieties were not put into place.  Transactions were not reported in accordance with its own policies and with GAAP.  Accordingly, Section 13(b)(2)(B) of the Exchange Act was violated.

91.     The lack of adequate internal controls rendered Xybernaut's Relevant Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, throughout the Relevant Period, the

quarterly and annual financial statements were issued by the Individual Defendants without ever disclosing the existence of the significant and material deficiencies in the Company's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

### THE DIRECTOR DEFENDANTS' WRONGDOING

92.    The Director Defendants had a responsibility to ensure that proper financial controls and procedures were in place at Xybernaut at all times.

93.    Section 13(b)(2) of the 1934 Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]." These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Investments*, *Ltd.*, 567 F.Supp. 724, 750 (N.D. Ga. 1983).

94.    AU 319.06, Internal Control in a Financial Statement Audit, defines internal controls as "a process - effected by an entities board of directors, managements, and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

95. The Defendant Directors violated 13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities.

96. Xybernaut's lack of adequate internal controls rendered its Relevant Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, as detailed above, throughout the Relevant Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

97. The conduct of Defendants Ginsberg, Soyster and Pearce was particularly egregious in that they were members of Xybernaut's Audit Committee throughout the Relevant Period. According to the Company's Proxy filed November 15, 2004, the Audit Committee, among other things, "reviews the financial reports and other financial information provided by the Company to any governmental body and the public; the Company's system of internal controls regarding finance, accounting, legal compliance and ethics … and the Company's auditing, accounting and financial reporting processes generally." Additionally, the Audit Committee recommends to the Board the selection of independent auditors. The Director Defendant members of the Audit Committee clearly failed in these responsibilities.

98. As a result of the Director Defendants' wrongful conduct, Xybernaut has been named as a Defendant in numerous securities class action lawsuits, is the subject of SEC and Department of Justice investigations and has incurred, and will continue to incur, millions of dollars in expenses.

99.    The Company should not have to bear the enormous financial burdens caused by the actions of the Director Defendants who breached their fiduciary duties owed to Xybernaut.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

100.    Plaintiff brings this action derivatively in the right and for the benefit of Xybernaut to redress injuries suffered and to be suffered by Xybernaut as a result of the breaches of fiduciary duty by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

101.    Plaintiff will adequately and fairly represent the interests of Xybernaut and its shareholders in enforcing and prosecuting its rights.

102.    Plaintiff is an owner of Xybernaut common stock and was an owner of Xybernaut common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

103.    Xybernaut's Board of Directors is currently composed of six (6) directors – Individual Defendants Ginsberg, Yamaoka, Pearce, Soyster, Merten and Tuttle.[3]

104.    Defendant Ginsberg has been a member of the Board of Directors since March 2003.  He is currently a Co-chair of the Office of the Chairman of the Board of Directors.  Ginsberg also served on the Audit Committee of the Board of Directors during the Relevant Period.

105.    Defendant Yamaoka has been a member of the Board of Directors since March 2003.

---

[3] Because Xybernaut's  Board consists of an even number of Directors (6 members), Plaintiff only needs to demonstrate that demand is futile regarding one-half of the Directors; i.e., in this case, three (3) Directors.

106.    Defendant Pearce has been a member of the Board of Directors since 1995. Pearce also served on the Audit Committee of the Board of Directors during the Relevant Period.

107.    Defendant Soyster has been a member of the Board of Directors since January 1995.  He is currently a Co-chair of the Office of the Chairman of the Board of Directors.  Soyster also served on the Audit Committee of the Board of Directors during the Relevant Period.

108.    Defendant Merten has been a member of the Board of Directors since September 1998.

109.    Defendant Tuttle has been a member of the Board of Directors since June 2004.  He is currently a Co-chair of the Office of the Chairman of the Board of Directors.

110.    As a result of the facts set forth herein, Plaintiff has not made any demand on Xybernaut's Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the additional following reasons:

a.    Defendants Ginsberg, Soyster and Pearce are members of the Board's Audit Committee.  Their responsibility was to monitor and oversee the corporate reporting process and external audits of Xybernaut. Specifically, as members of the Audit Committee, Defendants Ginsberg, Soyster and Pearce had the duty and responsibility of "monitoring, reviewing and, if applicable, implementing the rules and regulations promulgated under the [Sarbanes-Oxley Act of 2002] relating to the corporation's auditing, accounting and financial reporting process generally."  Based  upon recent announcements concerning the lack of controls and inability to rely on previously filed financial statements by the Company and Grant Thornton, it is obvious that Defendants Ginsberg,

Soyster and Pearce not only failed in their obligations as members of the Audit Committee, but they completely abrogated their responsibilities thereunder as well. Because Defendants Ginsberg, Soyster and Pearce directly participated in the wrongdoings because of the aforementioned failures, it is reasonable to conclude that they would not authorize suit against their fellow committee members. As such, demand on Defendants Ginsberg, Soyster and Pearce is futile;

b.      Defendants Tuttle and Soyster are both retired general officers from the U.S. Army, as well as graduates of the U.S. Military Academy (West Point). Over the course of their long military careers, Defendants Tuttle and Soyster developed a close personal and professional relationship such that it is reasonable to conclude that neither individual would authorize suit against the other. As such, demand against Tuttle and Soyster is futile.

c.      A majority of Xybernaut's Board of Directors and senior management participated in the wrongs complained of herein. Xybernaut's directors are not disinterested or independent due to the following: Director Defendants served on the Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the Director Defendants breached the fiduciary duties that they owed to Xybernaut and its shareholders in that they failed to prevent and correct material misrepresentations made by the Company. Further, the Director Defendants are not independent because of their stake in the financial performance of the Company;

d.      The Director Defendants of Xybernaut, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Xybernaut's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

e.      In order to bring this suit, a majority of the Directors of Xybernaut would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

f.      The acts complained of constitute violations of the fiduciary duties owed by Xybernaut's officers and directors and these acts are incapable of ratification;

g.  Any suit by the current directors of Xybernaut to remedy these wrongs would likely expose the Individual and Director Defendants, and Xybernaut, to additional liability for violations of the securities laws that would result in civil actions being filed against the Individual and Director Defendants;

h.  Xybernaut has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Xybernaut any part of the damages Xybernaut suffered and will suffer thereby;

i.  If the current Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual and Director Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

j.  If Xybernaut's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Xybernaut.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual and Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Xybernaut against these Director Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Xybernaut, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Xybernaut to sue them, since they will face a large uninsured liability.

111.    Plaintiff has not made any demand on the shareholders of Xybernaut to institute this action since demand would be a futile and useless act for the following reasons:

    a.    Xybernaut is a publicly held company with approximately 179.20 million shares outstanding, and thousands of shareholders;

    b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

112.    Xybernaut has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

    a.    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

    b.    Costs and legal fees for defending Xybernaut and the Individual and Director Defendants against private class action litigation arising from illegal and improper conduct alleged herein.

### FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred twelve (112) above as if set forth fully herein.

114.    The Individual Defendants owed and owe Xybernaut fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Xybernaut the highest obligation of good faith, fair dealing, loyalty and due care.

115.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

116.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Xybernaut has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

118.    Plaintiff, on behalf of Xybernaut, has no adequate remedy at law.

### SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through  one hundred eighteen (118) above as if set forth fully herein.

120.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Xybernaut, for which they are legally responsible.

121.    As a direct and proximate result of the Individual Defendants' abuse of control, Xybernaut has sustained significant damages.

122.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of Xybernaut, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred twenty-three (123) above as if set forth fully herein.

125.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Xybernaut in a manner consistent with the operations of a publicly held corporation.

126.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Xybernaut has sustained significant damages in excess of millions of dollars.

127.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

128.    Plaintiff, on behalf of Xybernaut, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred twenty-eight (128) above as if set forth fully herein.

130.    As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Xybernaut to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

131.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf of Xybernaut, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Individual Defendants
### for Unjust Enrichment

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred thirty-two (132) above as if set forth fully herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Xybernaut.

135.    Plaintiff, as shareholder and representative of Xybernaut, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against Defendant E. Newman for Breach of
### Fiduciary Duties, for Insider Selling and
### For Misappropriation of Information

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred thirty-five (135)  above as if set forth fully herein.

137.    At the time of the stock sales set forth herein by Defendant E. Newman's wife, she knew through her husband that the information described above was false and misleading and sold Xybernaut common stock on the basis of such information.

138.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendant E. Newman used for his own benefit when he had his wife sell Xybernaut common stock.

139.    Defendant E. Newman's sale of Xybernaut common stock through his wife while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duty of loyalty and good faith.

140.   Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendant E. Newman's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendant E. Newman obtained thereby.

## SEVENTH CAUSE OF ACTION

### Against Grant Thornton
### For Professional Negligence and Accounting Malpractice

141.   Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred forty (140) above as if set forth fully herein.

142.   In performing auditing and accounting services on behalf of Xybernaut and engaging in the wrongful acts alleged herein, Defendant Grant Thornton knew or should have known that its client would, and did, transmit false and misleading financial information to the investing public.  However, Defendant Grant Thornton failed to discharge its duties regarding Xybernaut's failure to adhere to GAAP and Grant Thornton failed to conduct its audits in accordance with GAAS by failing to detect and report the Individual Defendants' intentional errors and irregularities.

143.   In performing the auditing and accounting services for Xybernaut in the manner alleged herein, Defendant Grant Thornton breached its fiduciary duty to Xybernaut and its shareholders to use such skill, care and diligence as members of their profession are required to exercise.   Defendant Grant Thornton, however, breached such duty by committing the wrongful acts and conduct alleged herein.

144.   Xybernaut relied, to its detriment, on Defendant Grant Thornton and was damaged thereby.

145.   As a direct, foreseeable and proximate result of Defendant Grant Thornton's breach of said duty owned to Xybernaut, Xybernaut was damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

### Against Grant Thornton
### For Aiding and Abetting Breaches of Fiduciary Duty

146.   Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred forty-five (145) above as if set forth fully herein.

147.   Defendant Grant Thornton aided and abetted the other Individual Defendants in breaching their fiduciary obligations owed to Xybernaut resulting in the wrongdoing and damages to Xybernaut complained of herein.  Grant Thornton knew or should have known that Xybernaut's financial statements during the Relevant Period contained materially false and misleading information.  Grant Thornton also knew or should have known that the false and misleading information would be used, in whole or in part, by Xybernaut to prepare its publicly reported financial results and financial statements.  Nonetheless, Grant Thornton prepared and/or approved the false and misleading financial information and thereby aided and abetted Individual Defendants' breaches of fiduciary duty complained of herein.

148.   As a direct, foreseeable and proximate result of Defendant Grant Thornton's aiding and abetting of Individual Defendants' breaches of fiduciary duties, Xybernaut has been damaged in amounts to be proven at trial.

### NINTH CAUSE OF ACTION

### Against E. Newman and Davis
### Forfeiture Of Bonuses And Profits Under
### Section 304 Of The Sarbanes-Oxley Act

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred forty-eight (148) above as if set forth fully herein.

150.    During the Relevant Period, Defendant Davis was the CFO of the Company and Defendant E. Newman was the CEO of the Company.

151.    Defendants Davis and E. Newman received bonuses and incentive-based compensation during the Relevant Period.

152.    Defendants Davis and E. Newman realized profits from the sale of Xybernaut securities during the Relevant Period.

153.    The Company is required to prepare an accounting restatement due to material noncompliance, as a result of the misconduct of E. Newman and others, with a number of financial reporting requirements under the federal securities laws.

154.    The misconduct of Defendant E. Newman, among others, caused Xybernaut's material noncompliance with the financial reporting requirements, and the need for the Company to restate its reported financials.

155.    Therefore, under Section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, defendants Davis and E. Newman must disgorge their compensation during the Relevant Period to the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.    Awarding to Xybernaut restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Director Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:        June 29, 2005

Respectfully Submitted,

Joseph N. Gielata (DE # 4338)
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, Delaware 19809
(302) 798-1096/FAX: (302) 792-0777

***Attorney for Plaintiff***

**OF COUNSEL**

William B. Federman
W. Todd Ver Weire
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/FAX: (405)239-2112

## VERIFICATION

I, _Charles W. Smith_ declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") prepared on behalf of Xybernaut Corporation, and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Xybernaut Corporation common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_June 21, 2005_
**Date**

_Charles W. Smith_

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CHARLES W. SMITH, Derivatively On Behalf Of Nominal Defendant Xybernaut Corporation, | ) ) ) | |
|      Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | |
| EDWARD G. NEWMAN, STEVEN A NEWMAN, THOMAS D. DAVIS, BRUCE C. HAYDEN, MARC GINSBERG, MARTIN E. WEISBERG, NORITSUGU YAMAOKA, PHILLIP E. PEARCE, HARRY E. SOYSTER, EDWIN VOGT, ALAN G. MERTEN, JAMES J. RALABATE, WILLIAM G.T.TUTTLE and GRANT THORNTON LLP, | ) ) ) ) ) ) ) ) | |
|      Defendants. | ) ) | |
| and | ) ) | |
| XYBERNAUT CORPORATION, | ) ) | |
|      Nominal Defendant. | ) ) | |

## <u>CERTIFICATE OF FINANCIALLY INTERESTED PERSONS</u>

Plaintiff Charles W. Smith files this Certificate of Financially Interested Persons with the Court. The following persons and/or entities have a financial interest in this case:

1.     Charles W. Smith;

2.     Edward G. Newman;

3.     Steven A. Newman;

4.     Thomas D. Davis;

5.     Bruce C. Hayden;

6.     Marc Ginsberg;

7.     Martin E. Weisberg;

8.     Noritsugu Yamaoka;

9.     Phillip E. Pearce;

10.    Harry E. Soyster;

11.    Edwin Vogt;

12.    Alan G. Merten;

13.    James J. Ralabate;

14.    William G.T. Tuttle;

15.    Grant Thornton, LLP;

16.    <u>XYBERNAUT CORPORATION</u> (PNK: XYBR.PK)

17.    All counsel of record;

18.    There could be one or more insurance carriers interested; however such information would presently be in the possession of the Defendants.

DATED:  June 29, 2005.

Respectfully submitted:

William B. Federman
W. Todd Ver Weire
FEDERMAN & SHERWOOD.
120 N. Robinson, Suite 2720
Oklahoma City, Oklahoma  73102
Telephone:  (405) 235-1560
Telecopier:  (405) 239-2112
*wfederman@aol.com*
tvw@federmanlaw.com

*Attorneys for Plaintiff*